FILED
AUG 1 2002
Phil Lombardi, Clerk
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

STEPHENSON EQUITY COMPANY, a )
Texas general partnership, )
)
Plaintiff, )
)
v. ) Case No. _____
)
MARSH USA, INC., formerly known as )
J&H MARSH & McLENNAN, INC. and as ) 02CV615 EA(J)
MARSH & McLENNAN, INC., and JAMES )
F. HALL, individually and as agent of )
MARSH USA, INC., )
)
Defendants.

## COMPLAINT

Plaintiff Stephenson Equity Company ("SECO"), for its Complaint against Defendants, Marsh USA, Inc., formerly known as J&H Marsh & McLennan, Inc. and as Marsh & McLennan, Inc. ("Marsh"), and James F. Hall ("Hall"), individually and as an agent of Marsh, alleges and states as follows:

### PARTIES, JURISDICTION AND VENUE

1. SECO is a Texas general partnership formed and existing under the laws of the State of Texas, having its principal place of business in Dallas, Texas. A general partner of SECO is Charles C. Stephenson, Jr. ("Stephenson"), who resides in Tulsa, Oklahoma. Stephenson is also the Chairman of the Board of Directors of Vintage Petroleum, Inc. ("Vintage") and, through SECO, has significant holdings of Vintage stock. Vintage, an oil and gas company, has its headquarters in Tulsa, Oklahoma, and its stock is publicly traded on the New York Stock Exchange.

2. Marsh is a Delaware corporation, with its principal place of business in New York, New York. Marsh is qualified to do business in both Oklahoma and Texas.

3. On information and belief, Hall is an individual who resides in New York, New York. Upon information and belief, Hall is a vice president of Marsh and, during all times described herein, acted as an agent of Marsh.

4. Marsh and Hall, directly or indirectly, made use of the means or instruments of transportation and communication in, and the means or instrumentalities of, interstate commerce, including but not limited to the United States mails and interstate wires, in connection with the transactions, acts, practices and courses of business alleged herein. Certain of the transactions, acts, practices and courses of business alleged herein took place in the Northern District of Oklahoma, including, but not limited to, the dissemination of materially false and misleading statements and materials, as well as the concealment of material facts.

5. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332, because Plaintiff and Defendants are citizens of different States, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events and omissions giving rise to these claims occurred in this District.

## FACTS

7. This lawsuit involves Marsh's and Hall's activities and conduct in conjunction with an entity known as Credit Bancorp, Ltd., a Netherland Antilles corporation, and its domestic subsidiary, Credit Bancorp, Inc. (collectively, "CBL").

8. CBL engaged in an ongoing scheme in which it obtained control over marketable securities owned by individuals or entities holding large blocks of restricted stock whose sale is

regulated by the Securities and Exchange Commission ("SEC"). As part of this scheme, CBL represented that investors could obtain a "risk-free" return without relinquishing ownership of these securities. CBL further represented that the securities were to be placed in accounts controlled by a trustee (and not by CBL) at major financial institutions. Investors were told that their stock would not be sold, margined, pledged or hypothecated; rather, revenues were to be generated from a line of credit that was to be obtained by CBL based on the value of the securities in the trust accounts, the proceeds from which were then to be invested in risk-free arbitrage transactions, which would generate revenues. CBL represented to investors that major European banks would provide the credit lines necessary for these transactions.

9. In order to entice and induce investors to turn their securities over to CBL, CBL represented to investors that its and the trustee's activities, as well as the investors' securities, were fully insured through Marsh and others, and that any losses would be fully reimbursed through that insurance. Marsh and Hall knew that CBL needed to represent full insurance coverage for its operations and its investors' securities, in order to induce investors, such as SECO, to transfer privately-held stock to CBL's trustee.

10. CBL did not, in fact, place the securities in trust accounts. Instead, the securities obtained from investors were placed in accounts controlled by CBL and its president and chief executive officer, Richard Blech ("Blech"). The securities were then "margined" or sold, with the proceeds being wired to bank accounts in the United States and Europe for the benefit of CBL, Blech, and those acting in concert with them, including Marsh and Hall.

11. Marsh and Hall did not act simply as insurance brokers for CBL. To the contrary, Marsh and Hall entered into a strategic alliance (conspiracy) with CBL, working with CBL to

3

further the illegal and wrongful activities of CBL. That close strategic alliance among Marsh, Hall, and CBL is evidenced by, <u>inter alia</u>, the following:

(a) Marsh was identified to potential CBL investors as a "consultant" to CBL;

(b) Hall was identified to potential CBL investors as a person to call to answer questions about CBL's operations, the documents to be executed by investors for the transfer of their stock to CBL's trustee, and insurance coverage for CBL's operations;

(c) Marsh and Hall assisted CBL at seminars for new and prospective clients, as well as taking calls directly from such prospective and existing clients;

(d) Marsh and Hall reviewed and revised CBL's marketing documents, as well as the various agreements to be executed by CBL's investors;

(e) Marsh's subsidiary, Lippiniott & Margulies, created a complete corporate identity and marketing program for CBL;

(f) Marsh and Hall drafted and executed reference letters to be used by CBL in its dealings with European banks, including Credit Suisse;

(g) Marsh and Hall had access to and reviewed the financial statements of CBL;

(h) Marsh and Hall revised Blech's introductory statements to CBL's financial statements;

(i) Marsh and Hall assisted CBL in a variety of business ventures and partnerships, associated with CBL's operations; and

(j) Marsh and Hall knew that CBL was using Marsh as a "stamp of approval" to induce potential investors to convey their stock to CBL.

12. In or about March, 1999, an agent of CBL contacted Stephenson to solicit the investment of SECO's shares of Vintage stock in CBL's "Insured Credit Facility Program." CBL represented that SECO could obtain returns from SECO's holdings of marketable shares of stock that could not be immediately sold because of Stephenson's position with Vintage. CBL represented to SECO that it would pay to SECO an annual return of four percent (4%) of the value of SECO's securities, a return generated from a program of arbitrage trading based on a

4

line of credit obtained from unidentified "major European banks." CBL represented that the banks would use this line of credit to make back-to-back trades, ensuring a risk free transaction. In the event of a loss on a transaction, CBL represented that it could cancel the trade without loss.

13. After Stephenson expressed an interest, CBL, Marsh, and/or Hall, at various times, represented to Stephenson that SECO could deposit into one or more CBL accounts SECO's Vintage stock and receive a return of four percent (4%) per year with no risk.

14. At various times, Marsh, Hall, and/or CBL represented to Stephenson that SECO would retain full ownership of the Vintage stock.

15. At various times, Marsh, Hall, and/or CBL also represented to Stephenson that the placement of SECO's Vintage stock in a custodial account would allow CBL to take the value of the Vintage securities and make investments using the stock as an "off balance sheet credit."

16. Marsh, Hall, and/or CBL employees also spoke with J. Frederic Storaska ("Storaska"), one of Stephenson's financial advisors, and the owner of an entity called "CES," which is also a general partner in SECO, regarding the Insured Credit Facility program. Marsh, Hall, and/or CBL represented to Storaska that certain unidentified European banks provided unsecured trading loans to CBL. Marsh, Hall, and CBL further stated that CBL then engaged in "riskless arbitrage trading" using the line of credit provided by these banks.

17. Marsh, Hall, and CBL further represented to SECO that its investment would be "totally" insured by Lloyds of London. It was represented by Marsh, Hall, and CBL that the insurance policies would provide coverage anywhere in the world in transit or at rest, including

5

payments to CBL or to any clearance system or agency with which securities were held or deposited.

18. Marsh, Hall, and/or CBL also represented that the insurance coverage was issued after a purported extensive investigatory effort and a thorough risk analysis carried out on behalf of Lloyd's of London, various underwriters, and Marsh.

19. SECO was provided with a CBL summary plan document entitled "Credit Bancorp -- The CBL Insured Credit Facility." Marsh was described in this circular as one of "The Players" and "Insurance Broker and Administrator." This circular specifically represented, among other things, that "the assets are held in a type-one (cash) account and cannot be margined, sold short, liened, encumbered or hypothecated in any manner, except by the owner." Furthermore, it represented that the assets would not be moved off-shore.

20. Based upon the above-described representations by CBL, Marsh, and Hall, on June 21, 1999, Stephenson, as a general partner of SECO, executed a "CBL Credit Facility Agreement" (the "CFA") between SECO and CBL. The CFA contained, among other things, the following provisions:

> 2.3     SECO will deliver to Trustee the specified fungible Assets . . . to be held in the United States . . . The Account . . . shall be pre-approved by SECO. . . . CBL, however, retains the sole right to transfer some or all of the Assets to other Accounts, provided that all Transfer Accounts are held by United States custodian facilities, in the United States . . . . CBL shall provide SECO, within five (5) business days after any transfer of any portion of the Assets . . . written notice detailing the transfer of the Assets, including the identification of all Transfer Accounts and the facilities holding such accounts.
>
> * * * *
>
> 4.3     Neither CBL nor Trustee will at any time sell, pledge, assign, margin, lien, hypothecate, encumber, or otherwise dispose of the Assets except as authorized in this Agreement.
>
> * * * *

4.6     The parties hereto agree that the Trustee shall subordinate any fiduciary or other duty he may have toward CBL or its affiliates in favor of Trustee's fiduciary duty toward SECO, which fiduciary duty is hereby acknowledged and affirmed. . .

21.     On June 15, 1999, SECO received a letter from CBL in which it was represented that the Vintage stock would be held in trust and the shares would not "be sold, pledged, assigned, margined, liened, hypothecated or otherwise disposed of." This letter constitutes the Trust Agreement. This Trust Agreement specifically incorporates the terms and conditions set forth in the CFA. In the Trust Agreement, it was further represented that SECO's Vintage stock would not be released to any third person.

22.     Pursuant to the representations of Marsh, Hall, and CBL, SECO delivered eight million (8,000,000) shares of Vintage stock into the Insured Credit Facility Program and received instructions from CBL to place the securities into four (4) separate brokerage accounts. Although SECO's shares of Vintage stock were subject to certain regulatory restrictions, the shares did not bear any restrictive legend on their face. The accounts into which SECO's Vintage stock was placed were maintained at various institutions, including, BT Alex Brown/DBSI, Swiss American Securities, Brown Brothers Harriman & Co., and National Financial/Fidelity.

23.     On information and belief, CBL then wrongfully disposed of SECO's Vintage stock by various means, including the following:

>   (a)     Two million (2,000,000)Vintage shares were delivered on June 28, 1999, into an account in the name of CBL at BT Alex Brown (now known as Deutsche Bank Securities, Inc.) ("DBSI"). Records maintained by DBSI reflect that the shares were placed into a CBL margin account and commingled with shares from other issuers. The shares have been used as collateral to secure a margin loan of approximately $15 million. Account records also reflect that large sums of money have been wired out of the account to an account maintained at Bank of America.

7

(b) Two million (2,000,000) Vintage shares were delivered on June 25, 1999, to an account in the name of Credit Suisse (Zurich) at its American broker-dealer, Swiss American Securities. By July 8, 1999, all but 500,000 shares delivered by SECO had been delivered out to other broker-dealers. Upon information and belief, the stock is not being held in a trust account at Swiss American.

(c) Two million (2,000,000) Vintage shares were delivered on July 2, 1999, into an unidentified account maintained at Brown Brothers Harriman & Co. ("BBH"). BBH records reflect that the Vintage shares were delivered into an account of one of its custodial clients and that those shares were delivered out to various broker-dealers between July 7, 1999 and September 22, 1999. Upon information and belief, the shares were delivered to five European financial institutions and one European broker-dealer. On information and belief, the stock is not being held in a trust account for the benefit of SECO.

(d) Two million (2,000,000) Vintage shares were delivered on June 25, 1999, into an account maintained in the name of CBL at National Financial/Fidelity. As of July 9, 1999, all of the securities, except for 100 shares, had been transferred out of the account.

SECO's Vintage stock was, on information and belief, then further transferred by CBL to other CBL-controlled accounts, and not for the benefit of SECO.

24. On information and belief, Marsh and Hall did not disclose pertinent and material information, or made false, material and/or negligent representations, as to CBL's and Blech's conduct and as to the financial stability and operations of CBL, including CBL's and Blech's misuse of privately-held securities, including SECO's Vintage stock, all to the detriment and damage of SECO. More specifically:

(a) Marsh and Hall did not disclose that they were questioned by potential investors, as early as August, 1997, as to whether CBL was "too good to be true;"

(b) Marsh and Hall did not disclose that they knew, perhaps as early as February, 1998, that CBL had been accused of converting Colorado Casino Resorts stock certificates, valued at over $4.2 million, which subsequently became the subject of litigation;

(c) Marsh and Hall did not disclose that they knew, as early as May, 1998, that Blech would not travel to the United States;

8

(d) Marsh and Hall did not disclose that they knew, in June, 1998, of the alleged conversion by CBL of one million shares of Fortune Financial Systems, Inc. stock, worth approximately $4.75 million;

(e) Marsh and Hall did not disclose that, as early as September, 1998, they knew that CBL did not have contractual agreements with the various depositories used in its operations;

(f) Marsh and Hall did not disclose that they knew, in October, 1998, that CBL was refusing to provide any written contracts with European banks, with which it was allegedly doing business, because of CBL's purported "confidential" relationship with the banks;

(g) Marsh and Hall did not disclose that, by at least November, 1998, they knew that a CBL executive, Thomas M. Rittweiger, had previously been charged with theft by deception;

(h) Marsh and Hall did not disclose that, by at least March, 1999, they knew of concerns being raised by certain Lloyds' insurance underwriters regarding mischaracterizations and misrepresentations in CBL's engagement letter, Master Securities Loan Agreement, Stock Loan Agreement, and the CFA;

(i) Marsh and Hall did not disclose that the auditor of CBL's 1997 financial statements had issued a qualified report on the financial statements;

(j) Marsh and Hall did not disclose that they knew, in April, 1999, that CBL's financial statements might not present fairly in all material respects the financial position of the company;

(k) Marsh and Hall did not disclose that, in May, 1999, they knew of potential underwriter concerns that ultimately caused that underwriter to cancel its support of a portion of CBL's insurance coverage;

(l) Marsh and Hall did not disclose that they knew about allegations of the misappropriation of 950,000 shares of LCA Vision Inc. stock;

(m) Marsh and Hall did not disclose that they sought to conceal information from underwriters regarding legal matters between CBL and at least one of its customers;

(n) Marsh and Hall misrepresented, negligently represented, or at least implied, that they had conducted significant due diligence with respect to CBL's operations;

(o) Marsh and Hall did not disclose that they knew that the representations in CBL's marketing materials did not accurately describe the actual insurance coverage provided for CBL's operations;

(p) Marsh and Hall knew, or should have known, that certain underwriters' investigators had "identified disturbing facts" about CBL, including that:

    (i) CBL was not regulated nor authorized to conduct investment business in the United Kingdom, Ireland, Switzerland, or the United States;

    (ii) the trustee did not have any legal expertise with banking, investment, or related financial services matters;

    (iii) underwriters' requests for information were not being met;

    (iv) no documentation demonstrated that CBL was a viable, potentially profitable, investment vehicle; and

    (v) CBL was "more of a risk" than various people had been led to believe.

(q) Marsh and Hall knew, or should have known, that CBL's marketing literature inaccurately provided that: (a) investors' "assets [were] held in safekeeping, never pledged, protected by the Trust;" (b) "'All Risk' Insurance – Comprehensive policy protects assets;" (c) "Credit Facility clients have never incurred a loss;" (d) all assets "cannot be sold or traded by the trustee, unless instructed by [the asset owner] in writing to do so;" and (e) assets would be returned immediately upon request by the asset owner;

(r) Marsh and Hall did not disclose that they knew that CBL was "playing loose" with the term "Insured" in identifying itself as an "Insured Credit Facility;"

(s) Marsh misrepresented or negligently represented that CBL was a "highly professional" organization and that it had always met its significant payment obligations.

25. On November 17, 1999, the SEC filed its Complaint against the CBL entities and their principals entitled <u>Securities and Exchange Commission v. Credit Bancorp, Ltd., et al.</u>, in the United States District Court for the Southern District of New York, Case No. 99 CV 11395 (RWS), alleging that CBL operated a complex securities fraud.

26. On December 8, 1999, SECO wrote to CBL requesting the immediate return of the Vintage stock. CBL did not return these securities. In fact, CBL could not return the stock

10

because, contrary to the explicit representations of Marsh, Hall, and CBL, CBL had converted the stock to its own account and then margined it heavily at various brokerage firms.

27. The Court appointed an equity receiver for CBL on January 21, 2000. The Receiver has been marshaling CBL's assets, and has proposed an interim plan of pro rata distribution among CBL's customers, including SECO. The Court and the Second Circuit Court of Appeals have approved this plan. Many stock investors, including SECO, will suffer significant losses under this plan. In addition, many investors, including SECO, have intervened in the SEC's action. As a result of these activities, the Court-appointed Receiver has estimated that SECO will lose no less than $23 million in order to recover its own Vintage stock.

28. On April 3, 2000, French authorities arrested Blech pursuant to a criminal complaint filed by the United States Attorney in the Southern District of New York in connection with his activities at CBL. Blech has been extradited to the United States and remains incarcerated.

## **FIRST CLAIM FOR RELIEF**
(Fraud)

29. SECO realleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 28 of this Complaint.

30. Marsh and Hall have perpetrated a fraud upon SECO by virtue of the above-described misrepresentations and omissions. The above-identified representations were of existing material facts, or were made about future acts with no intent to perform. The above-identified omissions were also of material facts.

31. In reliance on Marsh's and Hall's misrepresentations and omissions, and unaware of the true facts, SECO changed its position by entering into the CFA and the Trust Agreement,

11

and depositing with CBL eight million (8,000,000) shares of Vintage stock. Had SECO been aware of the true facts, it would not have taken these actions.

32. As a direct result of Marsh's and Hall's actions, SECO has been actually damaged by the fraudulent representations and concealment of material facts by Marsh and Hall in an amount to be proven at trial, but believed to be up to One Hundred Million Dollars ($100,000,000.00). Further, SECO is entitled to an award of exemplary damages as allowed by law.

## SECOND CLAIM FOR RELIEF
### (Constructive Fraud)

33. SECO realleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 32 of this Complaint.

34. At all relevant times, Marsh and Hall essentially acted as "investment advisors" directly to SECO or, in the alternative, acted in conjunction with CBL as investment advisors to SECO. As such, Marsh and Hall owed SECO a fiduciary duty as a matter of law. Additionally, and in the alternative, by virtue of SECO having placed confidence in the fidelity and integrity of Marsh and Hall in rendering investment advice and in recommending and facilitating SECO's transfer of its Vintage stock into the fraudulent CBL investment plan, a fiduciary relationship existed at all relevant times between SECO, Marsh, and Hall.

35. Despite having voluntary accepted such trust and confidence reposed in them by SECO, Marsh and Hall violated and abused such fiduciary relationship by intentionally, negligently, and with reckless disregard breaching its fiduciary duties of care to SECO in order to wrongfully gain an advantage over SECO by misleading SECO to its prejudice. In the alternative, Marsh and Hall aided, abetted, and conspired with CBL by assisting CBL in

breaching its fiduciary duties to SECO and by assisting CBL in wrongfully gaining an advantage over SECO by misleading SECO to its prejudice.

36. SECO reasonably and justifiably relief upon Marsh's and Hall's continuing fidelity until after Stephenson's Vintage stock had been transferred and subsequently converted.

37. As a direct and proximate consequence of Marsh's and Hall's constructive fraud, SECO has been actually damaged in an amount to be proven at trial, but believed to be up to One Hundred Million Dollars ($100,000,000.00). Further, SECO is entitled to an award of exemplary damages as allowed by law.

### THIRD CLAIM FOR RELIEF
**(Breach of Fiduciary Duty/Conspiracy to Breach Fiduciary Duty)**

38. SECO realleges and incorporates by reference the allegations contained in Paragraphs 1 through 37 of this Complaint.

39. SECO placed its trust and confidence in the integrity and fidelity of Marsh, Hall, and CBL. Due to the relationship among the parties, Marsh, Hall, and CBL owed to SECO a fiduciary duty and the duty to deal with SECO with the utmost good faith.

40. By its actions complained of herein, Marsh and Hall have breached the fiduciary duties owed to SECO. In the alternative, Marsh and Hall aided, abetted, and conspired with CBL in breaching CBL's fiduciary duties to SECO, and has taken affirmative actions to further said conspiracy.

41. As a direct result of these breaches of fiduciary duty, SECO has been actually damaged in an amount to be proven at trial, but believed to be up to One Hundred Million Dollars ($100,000,000.00). Further, SECO is entitled to an award of exemplary damages against Marsh and Hall as allowed by law.

## FOURTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

42. SECO realleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 41 of this Complaint.

43. Marsh and Hall owed SECO a duty to exercise reasonable care in making representations about CBL and the contemplated financial transaction that were true.

44. As alleged herein, Marsh and Hall made material misrepresentations to SECO regarding the legitimacy, integrity and safety of the fraudulent CBL investment plan, CBL's operations, and the manner in which shares of stock transferred into the CBL investment plan were held.

45. Marsh and Hall made such representations without any reasonable grounds for believing them to be true, and while Marsh and Hall knew or should have known facts that cast reasonable doubts upon the truth of such representations.

46. Marsh and Hall made such material misrepresentations for the purpose of, and with intent to, induce SECO to transfer the Vintage stock into the fraudulent CBL investment plan.

47. At the time SECO was so induced to transfer the Vintage stock, SECO was not aware of the falsity of Marsh's and Hall's untrue representations, and justifiable relied upon such untrue representations to its detriment.

48. As a direct and proximate consequence of Marsh's and Hall's negligent misrepresentations, SECO has been actually damaged an amount to be proven at trial, but believed to be up to One Hundred Million Dollars ($100,000,000.00). Further, SECO is entitled to an award of exemplary damages as allowed by law.

## FIFTH CLAIM FOR RELIEF
### (Negligence)

49. SECO realleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 48 of this Complaint.

50. At all relevant times, Marsh and Hall owed SECO a duty of reasonable care.

51. Marsh and Hall breached such duty of care by committing the acts and omissions alleged herein, including but not limited to the inducement of SECO to transfer its Vintage stock into the fraudulent CBL investment plan.

52. As a direct and proximate consequence of Marsh's and Hall's negligence, SECO has been actually damaged in an amount to be proven at trial, but believed to be up to One Hundred Million Dollars ($100,000,000.00). Further, SECO is entitled to an award of exemplary damages as allowed by law.

## SIXTH CLAIM FOR RELIEF
### (Civil Conspiracy)

53. SECO realleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 52 of this Complaint.

54. Marsh and Hall engaged in a conspiracy with CBL and others in the fraudulent CBL investment plan, in that Marsh and Hall were active participants and economic beneficiaries of the conspiracy. Marsh and Hall were direct, necessary, and substantial participants in the conspiracy, and were aware of their overall contribution to and furtherance of the conspiracy. The purpose and effect of the conspiracy was not only to perpetrate further and benefit from their wrongful acts and omissions, but also to prevent discovery of CBL's, Marsh's, and Hall's illegal and wrongful activities through concealment and deception.

15

55. Marsh's and Hall's participation in the furtherance of the conspiracy consisted primarily of finding and inducing unsuspecting investors, such as SECO, to transfer shares of stock into the fraudulent CBL investment plan.

56. As a direct and proximate consequence of wrongful acts and omissions committed in furtherance of said conspiracy, SECO has been actually damaged in an amount to be proven at trial, but believed to be up to One Hundred Million Dollars ($100,000,000.00). Further, SECO is entitled to an aware of exemplary damages as allowed by law.

## SEVENTH CLAIM FOR RELIEF
(Accounting)

57. SECO realleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 56 of this Complaint.

58. Marsh and Hall should be ordered to provide a full and fair accounting of the amounts that each has received through their participation in, and assistance of, CBL's wrongful and fraudulent activities.

## REQUEST FOR RELIEF

SECO requests that judgment be entered in its favor and against Marsh and Hall, jointly and severally, as follows:

(A) an award of actual damages;

(B) an award of exemplary damages as allowed by law;

(C) an order directing Marsh and Hall to prepare and present to the Court a sworn accounting of all proceeds and amounts each received through their participation in, and assistance of, CBL's wrongful actions;

(D)   such other and further relief as this Court may determine to be just, equitable and necessary, including, but not limited to, prejudgment and post-judgment interest and the costs of this action, including reasonable attorneys' fees as allowed by law.

Respectfully submitted,

**JURY TRIAL DEMANDED**

HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, P.C.

By: _____
Donald L. Kahl, OBA #4855
T. Lane Wilson, OBA #16343
320 South Boston Avenue, Suite 400
Tulsa, Oklahoma 74103-3708
(918) 594-0400

**ATTORNEYS FOR PLAINTIFF
STEPHENSON EQUITY COMPANY**

276704.1:734821:00360